RAZALL, Respondent, vs. RAZALL, Appellant.

*December 9, 1942—January 12, 1943.*

*Arthur K. Hellermann,* attorney, and *Bernard Soref* of counsel, both of Milwaukee, for the appellant.

For the respondent there was a brief by *Lorenz & Neubauer* of Milwaukee, and oral argument by *Ira S. Lorenz.*

FOWLER, J.   The only matter presently at issue is whether a finding of the circuit judge that the defendant is guilty of contempt of court for nonpayment of several instalments of alimony adjudged to be paid by him to the plaintiff by a modified order for permanent alimony contained in a judgment granting an absolute divorce to the plaintiff is "contrary to

the great weight and clear preponderance of the evidence." If it is the order must be reversed under the rule of this court so familiar as not to require citations to support it.

The controlling facts bearing upon this issue are that the judgment of divorce was entered November 18, 1919. The original judgment contained a provision for permanent alimony which has been several times modified. The last order of modification entered required payments of $35 bimonthly. All payments required of the defendant aggregating $16,500, including costs and attorney's fees were paid up to December 31, 1941, when the defendant was discharged from employment by the Razall Manufacturing Company, for which he performed some nominal services and for which he was at the time of his discharge receiving $28 per week. Since his discharge he has had no income except payments for his support made to or for him by the trustee of a spendthrift trust created by the will of his mother whereby the trustee is expressly prohibited from paying from the trust or its income any sum whatever for payment of alimony to the plaintiff. This trust was held a valid spendthrift trust free from alimony claims in proceedings to construe the mother's will in the county court of Milwaukee county wherein the will was admitted to probate. The payments from the trust are for defendant's board, lodging, and medical expenses, principally at sanatoria, paid by the trustee, and $35 a month paid by the trustee to the defendant personally for wearing apparel and for incidental expenses.

The testimony before the court in the contempt proceeding is without dispute except as to opinion evidence. The finding of contempt is based upon that testimony and the entire record of the case, but the record of the case has no bearing upon the defendant's ability presently either to pursue or to obtain gainful employment. The testimony of defendant's attending physician is that the defendant has diabetes for which he takes insulin; has high blood pressure; hardening of the

arteries which creates presenile dementia, and this aggravates his diabetic condition. He is fifty-seven years old. The hardening of the arteries makes his "actual age about seventy now.". His mentality reacts accordingly. His memory is poor. He is "disoriented at times;" "doesn't know where he is at." "In addition he has been taking excesses of alcohol and that has aggravated his condition. He is definitely presenile." He could not do a full week's work because of his physical condition. At the conclusion of this physician's testimony the trial judge stated:

"If I am called upon to decide this case upon the medical evidence that was presented here this morning I could only come to one conclusion, that must be obvious, and that is that this man is not capable of working. If he is not capable of working or earning any money, I can't find him guilty of contempt of court for not working."

We are of opinion that this first impression of the trial judge was entirely correct. It certainly was correct upon the evidence stated, and we are of opinion that the testimony subsequently taken confirms rather than refutes the conclusion above stated tentatively reached.

At a subsequent hearing a physician was produced by plaintiff who testified that he made a physical examination of the defendant and "found no physical disabilities." His general physical condition "appeared entirely normal." He showed no signs of any mental disease; is "physically able to do some type of work." The physician wouldn't "want to put in his hands a job involving a matter of trust, or a machine that might, because of mishandling, be the cause of accident to somebody else and produce an injury." Did not think the defendant "can do any bookwork and items of that kind;" "doesn't seem to be enough concerned about it, and doesn't seem to be alert enough mentally;" believed "he is able to work." Stated diabetes was present but "is under control;" made no mental examination except in a general way; and no

"psychiatric examination as to the measure of his normal capabilities and qualities;" found "hardening of arteries" and "blood pressure normal." Dr. Lorenz, head of the department of nervous and mental diseases of the medical school of the University of Wisconsin, made sufficient examination to "arrive at an opinion as to defendant's condition, and particularly his employability;" found evidence of "beginning of thickening of blood vessels—particularly those that supply the brain;" found him to be a "very mild-mannered, meek sort of an individual;" "he showed some confusion as to happenings within an hour or so;" has "a memory defect." The trouble is an "inability to impress him rather than his inability to recall." This evidences lack of interest and lack of mental energy. He shows "some slight involvement of the nervous structure of the lower extremity." Shows "presenile changes." Diabetes is a contributing factor to this. He has a "mental impairment on top of an inadequate personality." "If given a routine job or work, he might be capable of doing it for a time, but I wouldn't want to say that he could or would continue at it because, after all, there is such a complete lack of interest or 'mental energy.'" "He doesn't seem to care, and this appears not to be assumed." He is "more than lazy; he is helpless in the situation in which he finds himself." A long colloquy between the judge and witness occurred in which the doctor expressed opinion that if the defendant had the capacity to "use the will power to do things, and take an interest in things he could work," but he did not have that power, and had lost it long ago; if pressed by somebody directly over him he might be able to do ordinary duties, but without that pressure and direction he doubted if he would turn his hand. He might do some kind of minor work that required no great amount of physical energy or mental application if he didn't have to meet any situation and if direction were carried on by some other mind. No responsibility could be put in his hands. The doctor would not employ him or recommend him to any

employer and would advise any employer against employing him.

On inquiry of the judge whether it would be a good thing if the trustee of the spendthrift trust would provide a companion for him, a sort of guardian, somebody to supervise and control him, probably to get a couple of grasscutting jobs so he could earn about $15 a week so he could pay his wife, the doctor answered "I dare say it would be, under the circumstances." In answer to the query by the trial judge whether the defendant might be in a position to engage in 'a gainful occupation at this time, the doctor answered that he knew that was the issue and he had thought of that particularly and he would say "No." He did not know of any form of employment where he would regard him as "safe and capable."

Mr. Mathiowetz, trustee of the trust, who is a director and manager of Razall Manufacturing Company, testified as to defendant's employment there: "It was of no value to the corporation having Mr. Razall personally identified with its affairs. He was detrimental to the company because of his conduct and his habits. I could not figure out any way to pay Mr. Razall any salary at all out of the company." A salary to him would be "a gratuity." He is "suffering from a very bad affliction of diabetes and has indulged in excessive habitual drinking." He is not "in any condition to be acceptable for gainful occupation by anyone." "He is in very bad health. Since his mother's death in 1939, he has been in six or seven different institutions." The Razall Manufacturing Company until his mother's death was apparently a closed corporation whose ownership was limited to members of the Razall family. The defendant testified that he was willing to pay alimony from any money he could get from the estate; that his health isn't very good and he didn't think he could get a job, but hadn't tried to get any; he don't feel capable of doing work now since the doctors all told him not to; the trustee refuses to give him a job with the company;

his job with the company was the only job he ever had in his life.

The ultimate finding of fact made by the trial judge, expressed orally at conclusion of the trial, on which the adjudication of contempt is based is:

"I find him [defendant] guilty of contempt of court for his failure to have complied with the order of the court in that he has failed to work and earn sufficient money since January of this year [1942], this court being positive that he could have, if he wanted to, if he had willed to do so, earned enough, and I find that his conduct in failing to work and failing to pay was contumacious,—wilful and contumacious."

From numerous questions put and statements made by the trial judge during the hearings it is manifest that his idea was that the evidence supported the view that the defendant could do certain kinds of work mentioned by the judge—working in a vegetable garden, mowing lawns, sweeping floors—if he had someone to watch and direct him while so employed, and that the defendant could, had he tried, have procured employment under the conditions existing-sufficient to have earned $70 a month with which to pay the instalments of alimony, and that because he did not so do his conduct was wilful and contumacious. That the defendant could have so done seems to us entirely speculative—even fantastic; and it also seems to us that for not so doing his conduct cannot be characterized as either wilful or contumacious. We must, therefore, hold that the order of the court, so far as it adjudges the defendant guilty of contempt of court and subjects him to imprisonment, is against the great weight and clear preponderance of the evidence, and reverse the order with direction to modify the order accordingly.

*By the Court.*—The order of the circuit court is reversed, and the record is remanded with directions to the court to modify it in accordance with the opinion.

BARLOW and FRITZ, JJ., took no part.